IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HOWARD HUDSON, III,<br>    Plaintiff, | CIVIL ACTION |
| v. | |
| CHEYNEY UNIVERSITY OF<br>PENNSYLVANIA,<br>    Defendant. | NO. 14-2552 |

DuBois, J.                                December 14, 2018

**M E M O R A N D U M**

## I. INTRODUCTION

Plaintiff Howard Hudson, III, former Director of Information Technology at Cheyney University of Pennsylvania ("Cheyney"), alleges that his termination by Cheyney was motivated by retaliatory animus and discriminatory animus based on his race and gender, and that he was subject to a hostile work environment motivated by discriminatory and retaliatory animus. In the Amended Complaint, plaintiff raises claims of race and gender discrimination and retaliation under 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") against Cheyney.

Presently before the Court is Defendant Cheyney Univesity's [sic] Motion for Summary Judgment. For the following reasons, the Court grants defendant's motion as to all claims.

## II. BACKGROUND

The facts below are drawn from the record before the Court which the Court construes in the light most favorable to the nonmoving party as it must in ruling on a motion for summary judgment. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).[1] The material facts of record

---

[1] Plaintiff did not comply with this Court's Policies and Procedures, and filed a document titled "Plaintiff Howard Hudson's Statement of Undisputed Facts in Support of Its Motion [sic] for Summary Judgment" that did not

may be summarized as follows:

### A. Plaintiff's Employment Under Moszer's Supervision

Plaintiff, an African American male, was employed by defendant Cheyney beginning in June 1998, and served as the Director of Computer Services from June 2001 until his termination on December 5, 2010. Def. St. Undisputed Facts ¶ 1.

From approximately September 2008 to June 2009, plaintiff's direct supervisor was Dr. Irene Moszer, Interim Vice President of Finance, who is Caucasian. *Id.* at ¶ 3. Plaintiff asserts that he was subject to numerous discriminatory incidents during VP Moszer's tenure, which led him to consider notifying the EEOC in March 2009. Pl.'s St. Undisputed Facts ¶¶ 4-21. Plaintiff also claims that during this time, Moszer "engaged in 'belittling' micromanagement" and that two coworkers, Tara Kent and Phil Pagliaro, "nitpicked over all his decisions." Def. St. Undisputed Facts ¶¶ 16-17.

### B. First Protected Activity (March 2009)

Plaintiff reportedly engaged in a protected activity in March 2009, when plaintiff met with Director of Social Equity, Eric Almonte, and President of Cheyney, Michelle Howard-Vital, both of whom are African American, informing them of his intent to notify the EEOC that VP Moszer was discriminating against him. Pl.'s St. Undisputed Facts ¶ 23; Def. St. Undisputed Facts ¶ 22.[2] According to plaintiff, President Vital told him to "hold off from doing anything

---

"include a separate, short and concise statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement, as to which it is contended that there exists a genuine issue of material fact." Pursuant to this Court's Policies and Procedures, the Court deems all material facts set forth in the moving party's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment admitted unless controverted in the opposing party's statement of material facts.

[2] Defendant's statement of undisputed material facts states that this protected activity occurred in April 2009, but defendant noted in its Reply that plaintiff's "stated intention to pursue an EEOC charge" took place in March 2009. *See* Def. St. Undisputed Facts ¶ 22; Def. Reply at 1.

with the EEOC and or [sic] University Social Equity." Def. St. Undisputed Facts ¶ 56. The record is devoid of any 2009 EEOC charge. *Id*. at ¶ 22.

  C. **Counseling Letter from VP Moszer and Memorandum from President Vital**

In late March 2009, VP Moszer held a counseling session with plaintiff and President Vital to "review several behavioral issues" with plaintiff. In that session, plaintiff "pointed out [that] Moszer showed preferential treatment to Pagliaro and Kent," both of whom are Caucasian. Def. St. Undisputed Facts ¶¶ 6,15,18; Pl. St. Undisputed Facts ¶ 25; Pl. Ex. 7.

The behavioral issues discussed in the counseling session were set forth by VP Moszer in a counseling letter to plaintiff in which she detailed her supervisory concerns: "Hudson's conflict with Pagliaro; Hudson's circumventing her supervision, his various communications with Controller Holmes and State System staff; his anger when not included in a cabinet informational meeting; and his emails showing bad management skills." Def. St. Undisputed Facts ¶ 19; Pl.'s St. Undisputed Facts ¶¶ 23-25. The counseling letter also acknowledged that Moszer had mistakenly cancelled a $56,000 equipment order by plaintiff and praised plaintiff's technical expertise. Def. St. Undisputed Facts ¶ 19; Pl.'s St. Undisputed Facts ¶ 27.

Plaintiff removed the counseling letter from his personnel file, contrary to Cheyney procedure. Def. St. Undisputed Facts ¶ 21. In response, President Vital wrote a memorandum dated April 27, 2009 informing him that he "should never remove letters from [his] file without written authorization." Pl. Ex. 7-5. VP Moszer thereafter had a copy of the counseling letter returned to the file. Def. St. Undisputed Facts ¶ 21. According to plaintiff, President Vital assured him that the counseling letter would be expunged from his personnel file when VP

3

Moszer's interim position ended a few months later,[3] but the record was not expunged. Def. St. Undisputed Facts ¶ 22. At some time after VP Moszer left Cheyney, plaintiff submitted a rebuttal to the counseling letter.[4] *Id.* at ¶ 21.

      D.      **Plaintiff's Employment Under Coleman's Supervision**

In June or July 2009, Gerald Coleman, an African American male, replaced VP Moszer as plaintiff's supervisor. Pl.'s St. Undisputed Facts ¶ 28. In her June 2009 appraisal of plaintiff, VP Moszer warned VP Coleman not to trust plaintiff. *Id.* at ¶ 26. According to plaintiff, Coleman treated him in the same way that Moszer treated him. Def. St. Undisputed Facts ¶ 29. It is undisputed that by summer 2010, VP Coleman had independently observed discord between (1) plaintiff and Controller Layna Holmes; (2) plaintiff and Director of Business Support Monique Baylor; and (3) plaintiff and Pagliaro. *Id.* at ¶¶ 30-35.

      E.      **Second Protected Activity (August 2010)**

In August of 2010,[5] plaintiff engaged in his second protected activity, when he participated in an EEOC investigation of a gender discrimination charge against Cheyney by another Cheyney employee, Jennifer Jones. Pl.'s St. Undisputed Facts ¶ 29. Plaintiff provided the EEOC with an interview that supported Jones' discrimination claim. *Id.* at ¶ 29; Def. St. Undisputed Facts ¶ 37. However, nothing of record supports the contention that VP Coleman or Director Baylor were aware that plaintiff participated in the Jones investigation. Def. St. Undisputed Facts ¶ 37.

---

[3] The parties agree that if President Vital provided such an assurance to plaintiff, it would have occurred in March or April 2009, not October 2010 as alleged in the Amended Complaint. *See* Def. St. Undisputed Facts ¶ 22; Pl. Resp. Summ. J. at 17; Am. Compl. ¶16.
[4] The record does not disclose the date of plaintiff's rebuttal.
[5] Although the Amended Complaint states that this EEOC investigation took place in August 2009, both parties' statements of undisputed material facts and their corresponding exhibits state that this investigation occurred in August 2010. *See* Am. Compl. ¶ 12; Pl.'s St. Undisputed Facts ¶ 29; Def. St. Undisputed Facts ¶ 36.

F.  **After the Fact Purchase ("AFP") Violation and Website Shut-Down Order**

Plaintiff's retaliation complaint primarily arises from events that began two months after his second protected activity in August 2010. The prior year, in June 2009, plaintiff had obtained approval for provision of website hosting services for Cheyney by Innersync. Pl.'s St. Undisputed Facts ¶ 30. The Innersync contract expired on June 30, 2010 and required renewal by that date. Pl.'s St. Undisputed Facts ¶ 32. Despite the fact that plaintiff's supervisee Erica Sterling submitted a June 14, 2010 request to Cheyney's purchasing agent, Emmett Jones, to renew Cheyney's website contract, the $9,587.59 contract renewal was not authorized as of June 30, 2010.[6] Pl.'s St. Undisputed Facts ¶ 32; Def. St. Undisputed Facts ¶ 43.

On September 30, 2010, Sterling, who had been corresponding with Innersync, contacted the Cheyney purchasing department to request expedited payment, informing them that "[t]he vendor (Innersync) would like to know when they can expect payment. I don't want them to take the website down." *Id.* at ¶ 34; Pl. Ex. 8-2. Sterling sent another email on October 5, 2010, this time to VP Coleman, President Vital, Director Baylor, plaintiff, VP Coleman's assistant Elisabeth Burton, and purchasing agent Jones, which warned that Innersync had called her three times requesting payment, and "[w]e need to pay them as soon as possible otherwise, [sic] this company has the right to take down our website until they are paid."[7] Pl. Ex. 8-4.

On the same day that she received Sterling's email, Baylor, who along with Controller Holmes was responsible for paying contractors on time, sent plaintiff and two others a violation

---

[6] Other than the fact that the Pennsylvania State System of Higher Education had to pre-approve Cheyney expenditures, the record does not explain the cause for the delay in purchase authorization. Def. St. Undisputed Facts ¶ 5. The record also does not disclose whether the Cheyney website renewal contract with Innersync was eventually authorized.

[7] Although Sterling communicated with Innersync, Cheyney's purchasing department's internal software listed plaintiff, Sterling's supervisor, as the "requisitioner" for the website renewal contract. Pl. Ex. 8-2.

letter informing each of them that they had made an after the fact purchase ("AFP") in that they failed to have "an 'authorized' purchased order/contract in place from the Procurement Office before any expenditures [were] made on behalf of the University." Pl. Ex. 9; Def. St. Undisputed Facts ¶¶ 33, 40. These violation letters were "a routine prerequisite in 2010 for Cheyney to receive State System approval via a settlement in order to pay for the service such as the expired IT contract;" Baylor had also sent violation letters to two other Cheyney employees during the previous month. Def. St. Undisputed Facts at ¶¶ 42-44.

Plaintiff's violation letter notified him that he "purchased services from Innersync Studio" and used the same language contained in all the violation letters: "[your purchase] may result in **you** having the responsibility to pay for whatever goods or services were procured and . . . disciplinary action as well as termination of employment." *Id.* (emphasis in original).

Upon receiving the violation letter, plaintiff was "shocked, worried, confused, and humiliated." Pl. Am. Compl. ¶ 24. Within minutes of receiving the letter, he sent an email instructing Sterling to "[p]lease inform Intersync to take down the site immediately." Def. St. Undisputed Facts ¶ 47. The order, if executed, would have disabled access to the entire Cheyney University website for all students, faculty, management, and members of the public interested in Cheyney. *Id.* at ¶ 48. Plaintiff sent copies of the shutdown order to multiple Cheyney officials, including President Vital, VP Coleman and Baylor. *Id.* at ¶ 47.

Plaintiff said he intended the email order as a joke, and Sterling later told plaintiff that she knew he was joking. *Id.* at ¶ 49. However, plaintiff's email does not explain that he did not intend that Sterling follow his directive, and VP Coleman was aware that "in the past, [plaintiff] had disconnected internet access to Cheyney staff when [he] got upset with them." *Id.* at ¶¶ 39, 49, 61.

6

G.  **Confrontation with Baylor and Plaintiff's Termination**

Shortly after sending the order for Sterling to tell Innersync to shut down the Cheyney website, plaintiff went to VP Coleman's office, which Coleman's assistant had locked. Def. St. Undisputed Facts ¶ 50. Plaintiff encountered Baylor on the same floor, and he confronted her regarding the violation letter. Pl.'s St. Undisputed Facts ¶¶ 47-50. The details of the incident are in dispute. According to plaintiff and eyewitness employee Brenda Shields, plaintiff did not yell or curse. Def. St. Undisputed Facts ¶ 50. On the other hand, Baylor recalls plaintiff "literally jumping in her face." *Id*. The parties agree that Shields quickly intervened and escorted plaintiff away, and that Baylor returned to her office, noticing on her way that Coleman's office was locked. *Id*. at ¶¶ 50-52.

Immediately thereafter, Baylor reported the encounter in a complaint to HR Assistant Director Marcia Robinson, whose notes describe Baylor as "visibly shaken up, teary eyed and very 'blushed.'" Def. St. Undisputed Facts ¶ 52. Although VP Coleman claims to have seen the end of the exchange between plaintiff and Baylor, the statements of plaintiff, Baylor, and Shields do not "indicate that they observed Coleman outside his office." Pl.'s St. Undisputed Facts ¶¶ 56-57. However, VP Coleman did observe Baylor's reaction immediately after the incident, as he was present when Baylor reported her encounter to Robinson. Def. St. Undisputed Facts ¶ 52.

At VP Coleman's direction, HR Director Joanne Harris investigated Baylor's complaint and the issuance of the violation letter to plaintiff. Def. St. Undisputed Facts ¶ 53. When Harris interviewed Baylor the day after the incident, Baylor was shaking and crying as she had during her interview with Robinson the day before. *Id.* at ¶ 54. However, Harris's investigation did not result in conclusions regarding the facts of the Baylor incident, and her investigation into the

7

issuance of plaintiff's violation letter did not lead to discipline.[8]  *Id.* at ¶ 53.

On October 7, 2010, the day after Harris' interview of Baylor, VP Coleman suspended plaintiff with pay.  Def. St. Undisputed Facts ¶ 55.  On that same day, plaintiff filed an internal social equity complaint alleging that he was "discriminated against based on gender and race" and that he was "treated differently since his interview with the EEOC" about Jones.  Pl.'s St. Undisputed Facts ¶ 52; Def. St. Undisputed Facts ¶ 56.  Plaintiff also reported that "[l]ast year, I was accused of incidents that I did not commit by [Moszer].  I was told to hold off from doing anything the EEOC and or University Social Equity by the university President. . . . It has been a year and nothing has changed with my situation."  Def. St. Undisputed Facts ¶ 56.

In response to plaintiff's complaint, Cheyney hired an independent outside contractor, Rob DeSousa, to investigate plaintiff's internal discrimination complaint.[9]  Def. St. Undisputed Facts ¶ 71.  DeSousa's report, filed December 4, 2010, found "no inference of discrimination" or "any facts which show discrimination."  *Id.* at ¶ 72.  Plaintiff was terminated the following day. *Id.* at ¶ 73.  VP Coleman justified the termination on the grounds that plaintiff's "recent confrontational communication with a co-worker and direction to a staff member to disable the University website constitutes conduct unacceptable for a manager of the University and demonstrates an inability to successfully function as a manager of the University."  Pl. Ex. 4; Def. Ex. 35.  Coleman's termination letter also noted that plaintiff had "previously warned and counseled about similar behavior and exhibited poor performance" and did not "demonstrate improvement."  *Id*.  It is undisputed that Coleman was the primary decision-maker for plaintiff's

---

[8] The record does not disclose whether the other recipients of violation letters on October 5, 2010 were subject to any disciplinary action.
[9] Plaintiff also filed an EEOC charge on October 8, 2010, but withdrew the charge four days later to await completion of the Cheyney investigation.  Def. St. Undisputed Facts ¶ 59.

termination. Def. St. Undisputed Facts ¶ 63.

Plaintiff filed his first Complaint on May 5, 2014, and an Amended Complaint on July 22, 2014. Count I of the Amended Complaint is titled "Violation of Title VII (Race and Gender Discrimination);" Count II[10] is titled "Violation of Title VII ([R]etaliation)." Plaintiff's claims are imprecisely plead, but the Court agrees with Cheyney in construing the Amended Complaint to set forth claims of "hostile work environment and termination due to race and gender discrimination and discriminatory retaliation[] in violation of . . . Title VII."[11] Def. Mot. Summ. J. at 1.

Cheyney filed the pending Motion for Summary Judgment on May 1, 2018. Plaintiff filed a Response on June 12, 2018, and Cheyney filed a Reply on June 27, 2018. Cheyney's motion is ripe for decision.

### III. LEGAL STANDARD

#### A. Motion for Summary Judgment

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v.*

---

[10] Plaintiff's second count is erroneously entitled "Count IV."
[11] Count I of the Amended Complaint alleges that Cheyney "created an employment environment that that was discriminatory, hostile, and harassing to Plaintiff because of his race and gender," construed by the Court as a hostile work environment claim based on race and gender discrimination. Am. Compl. ¶ 50. Count I also incorporates the allegations in the preceding paragraphs of the complaint, which include the allegation that "Hudson's termination was motivated by discriminatory animus based on his gender and race." *Id*. at ¶ 43. Similarly, Count II avers that Cheyney "created an employment environment that was hostile and harassing to Plaintiff" in retaliation for his participation in the Jones EEOC investigation, construed by the Court as a claim for hostile work environment based on retaliation. *Id*. at ¶ 52. Finally, Count II incorporates all allegations contained in the preceding paragraphs of the complaint, including the allegation that "Hudson's termination was motivated by retaliatory animus for his participation in the EEOC's investigation of the Jennifer Jones charge," thus alleging retaliatory termination. *Id*. at ¶ 43.

9

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. However, the existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient. *Id.* In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, the party opposing summary judgment must identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

## IV. DISCUSSION

Plaintiff's Amended Complaint alleges that he was subject to a hostile work environment based on racial, gender and retaliatory animus and that he was terminated in retaliation for his participation in protected activities, or in the alternative, his termination was due to race and gender discrimination.

In its motion, Cheyney argues that plaintiff has failed to carry his burden of proving various elements of his *prima facie* case for any claims. Plaintiff, in turn, contends that he has provided sufficient evidence to show there are genuine issues of material fact to warrant denying Cheyney's motion for summary judgment on his claims of (1) retaliation and (2) hostile work environment based on retaliatory animus. Plaintiff's Response to Defendant's Motion for Summary Judgment does not address defendant's arguments rejecting the claims of hostile work environment based on race or gender discrimination and termination based on race or gender

10

discrimination, thereby abandoning those claims.[12]

The Court concludes that plaintiff (1) has abandoned his claims of hostile work environment based on race or gender discrimination and termination based on race or gender discrimination; (2) fails to provide adequate evidence of pretext in support of his retaliatory termination claim; and (3) fails to present a *prima facie* case of a retaliatory hostile work environment. Thus, Cheyney's Motion for Summary Judgment is granted as to all claims.

A. **Retaliation Claim**

Plaintiff alleges that he was unlawfully terminated in retaliation for his participation in Jones' August 2010 EEOC claim. Plaintiff also argues that he received a counseling letter and counseling memorandum in retaliation for his protected activity in telling Director Almonte and President Vital in March 2009 that he intended to file an EEOC charge of race and gender discrimination.[13] *See* Pl. Resp. at 17. Plaintiff did not plead the March 2009 protected activity in his Amended Complaint and raised the argument for the first time at the summary judgment

---

[12] "Courts within the Third Circuit have routinely held that a non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended." *Diodato v. Wells Fargo Ins. Servs., USA, Inc*., 44 F. Supp. 3d 541, 556–57 (M.D. Pa. 2014); *see also Certain Underwriters at Lloyd's London v. Creagh*, No. 12-571, 2013 WL 3213345, at *7 (E.D. Pa. June 26, 2013) (DuBois, J.), *aff'd sub nom. Certain Underwriters at Lloyds of London Subscribing to Policy No. SMP3791 v. Creagh*, 563 F. App'x 209 (3d Cir. 2014) ("defendants' failure to include an argument on the estoppel issue in any of their [summary judgment] motion papers 'constitutes abandonment' of that claim.") Even if plaintiff had not abandoned his claims of hostile work environment and termination based on race and gender, plaintiff fails to provide sufficient evidence of race or gender discrimination to establish a *prima facie* case.

[13] Plaintiff does not allege or argue that Cheyney took retaliatory action for his complaint of preferential treatment during the March 2009 counseling session, his October 7, 2010 internal social equity complaint or his October 8, 2010 EEOC complaint.

stage. Accordingly, this claim is deemed waived.[14]

Plaintiff's retaliation claim based on his participation in Jones' EEOC case is governed by the familiar burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Under this framework, plaintiff must first establish a *prima facie* case of retaliation. *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006). If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to defendant to present a legitimate, non-retaliatory reason for its decision. *Id.* at 342. If defendant provides a legitimate, non-retaliatory reason for its decision, plaintiff bears the burden "to convince the factfinder both that the employer's proffered explanation was false [that is, a pretext], and that retaliation was the real reason for the adverse employment action." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (internal citations omitted).

### i. Prima Facie Case

A *prima facie* retaliation claim requires plaintiff to demonstrate that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse action. *Id.*

---

[14] The Amended Complaint alleges a different protected activity, plaintiff's October 8, 2010 EEOC complaint, not the March 2009 protected activity, the complaint to Almonte and Vital. Am. Comp. ¶ 16, Def. Ex. 37. The Amended Complaint avers that Moszer's counseling letter was retaliation for plaintiff's involvement in the *Jones* EEOC investigation, not for his March 2009 complaint to Almonte and Vital. *Id*. at 15. Plaintiff's claim, raised for the first time in plaintiff's Response to Defendant's Motion for Summary Judgment, is deemed waived because plaintiff did not plead the protected activity in his Amended Complaint. *See Dubois v. Abode*, 142 F. App'x 62, 63 (3d Cir. 2005); *see also Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") Even assuming *arguendo* that the March 2009 alleged protected activity is not deemed waived and could be properly considered, plaintiff fails to state a *prima facie* claim of retaliation based on the March 2009 protected activity because the receipt of a letter and memorandum after a counseling session does not constitute an adverse employment action.

### a) *Protected Activity*

Plaintiff's participation in Jones' August 2010 EEOC investigation constitutes a protected activity under Title VII. *See Medero v. NBC Merchants, Inc.*, No. 16-6583, 2017 WL 3328361, at *5 (E.D. Pa. Aug. 3, 2017) ("participating in an EEOC investigation is a protected activity"); *see also Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006).

### b) *Adverse Employment Action*

An adverse employment action is "one that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001). Plaintiff's employment termination constitutes an adverse employment action.

Plaintiff avers two additional adverse employment actions: (1) the "receipt of an unfounded threat of termination and personal financial liability" in the violation letter; and (2) "hostility, micromanagement, and unfair criticism by Cheyney administrative employees," including criticism for "going over budget." Am. Compl. ¶¶ 14, 33; Pl. Resp. at 17.

The Court concludes that these additional incidents do not amount to adverse employment actions. "Hostility, micromanagement, and unfair criticism" such as complaining that plaintiff exceeded his budget do not aver actions "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Likewise, the threat of termination and personal financial liability in the violation letter does not amount to an adverse employment action because no punitive action was taken against plaintiff for his

13

allegedly unauthorized purchase.[15] *See LeBlanc v. Hill Sch.*, No. 14-1674, 2015 WL 144135, at *16 (E.D. Pa. Jan. 12, 2015) ("[W]hen an employer threatens to take an action but does not in fact take that action, the threat does not constitute a materially adverse employment action."); *see also Boandl v. Geithner*, 752 F.Supp. 2d. 540, 564 (E.D. Pa. 2010) (concluding that a referral for an investigation alone did not constitute an adverse employment action). Thus, only plaintiff's termination provides a viable adverse employment action.

### c) *Causal Connection*

At the *prima facie* stage, "plaintiff must produce evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse [employment] action.'" *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017). Assuming *arguendo* that plaintiff established an adequate causal connection for a *prima facie* case of retaliation, plaintiff's claim fails under the third step of the *McDonnell Douglas* burden-shifting framework because plaintiff has presented insufficient evidence to permit a reasonable jury to conclude that defendant's proffered reasons for his termination were pretextual.

### ii. Defendant's Reasons for Termination

In the second step of the *McDonnell Douglas* framework, defendant bears the burden of producing a legitimate, non-retaliatory explanation for its decision to terminate plaintiff.

The Court concludes that defendant has articulated three legitimate, non-retaliatory reasons for plaintiff's termination. Specifically, Cheyney claims that VP Coleman based his decision on: "1) Hudson's ordering a shutdown of Cheyney's website, 2) Hudson's interaction

---

[15] Plaintiff has not plead (nor does the record support) a claim that the after-the-fact purchase was a reason for his termination. Instead plaintiff avers that Baylor's violation letter was "a deliberate effort to harass and humiliate [him]." Pl. Am. Compl. ¶ 31.

14

with Baylor that left her fearful for her safety, combined with 3) Coleman's observation of Hudson's lack of collaboration and never-ending disputes with multiple colleagues." Def. Mem. Mot. Summ. J. at 22.

Based on this evidence, the Court concludes that defendant has proffered legitimate, non-retaliatory reasons for plaintiff's termination. Accordingly, the burden shifts back to plaintiff to prove that defendant's reasons for termination were pretextual.

### iii. Plaintiff's Evidence of Pretext

To show pretext, a plaintiff has the burden "to demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions from which a reasonable juror could conclude that the Defendant['s] explanation is unworthy of credence, and hence infer that the employer did not act for the asserted [non-retaliatory] reasons." *Carvalho-Grevious*, 851 F.3d at 262. For Title VII retaliation claims, a plaintiff "must prove a 'determinative effect' . . . by a preponderance of the evidence that there is a 'but-for' causal connection between the adverse employment action and retaliatory animus." *Id*. at 258 (internal quotations omitted).

Plaintiff argues that VP Coleman's stated reasons for termination "[are] a pretext to cover defendant's retaliatory termination of plaintiff." Pl. Resp. at 19. Specifically, plaintiff contends that the evidence challenging whether Coleman viewed the confrontation between Baylor and plaintiff proves pretext.[16] The Court concludes that plaintiff fails to show such weaknesses in Cheyney's explanation that a reasonable juror could infer that plaintiff's protected activity had a "determinative effect" on plaintiff's termination.

Plaintiff proffers evidence of two contested facts in support of his claim of pretext. First,

---

[16] Plaintiff alleges in his Amended Complaint that white and female employees engaged in "serious confrontations" and were not terminated. Pl. Am. Compl. ¶¶ 37, 39, 41. Plaintiff fails to address this issue in his submissions in opposition to the motion for summary judgment. Thus, the argument is deemed waived.

plaintiff argues that his testimony and Shield's testimony—providing that plaintiff did not exhibit threatening behavior towards Baylor—"d[o] not support Baylor's claim that she was assaulted by [plaintiff]." Pl.'s Resp. at 18. Second, plaintiff contends that Coleman's termination justifications were pretextual because of conflicting evidence on whether Coleman observed the Baylor incident. Specifically, Coleman testified in his deposition that he recalled seeing Baylor "cowering" as Shields escorted plaintiff away. Def. St. Undisputed Facts ¶ 55. In contrast, the depositions of Baylor and plaintiff provided evidence that Coleman's door was locked before and after the confrontation, and neither Baylor nor Shields nor plaintiff claim to have observed Coleman outside of his office. On the basis of these factual disputes, plaintiff submits that he was not terminated for assaulting Monique Baylor and that Coleman's justification for terminating plaintiff was pretextual. Pl.'s Resp. at 17-19.

Plaintiff's argument is unavailing. Even assuming that Baylor overreacted to a non-threatening conversation and that Coleman did not view the incident, plaintiff does not dispute that (1) a confrontation did occur; (2) Baylor did in fact have an extreme reaction to the encounter; and (3) VP Coleman witnessed Baylor's reaction shortly after the encounter. Significantly, plaintiff must do more than prove that Baylor's reaction was unwarranted; he must present evidence that Coleman's decision to terminate him was motivated by retaliatory animus. *See Dunsmuir v. May Dep't Stores Co.*, 120 F. App'x 927, 930 (3d Cir. 2005) ("As *Fuentes* instructs, an employee does not discredit his employer's proffered reason by showing that it was wrong or mistaken . . . the dispositive issue is whether retaliatory animus motivated the employer's decision."); *see also Emmett v. Kwik Lok Corp.*, 528 F. App'x 257, 261 (3d Cir. 2013).

Plaintiff has not presented any evidence that retaliatory animus motivated Coleman's

16

decision to terminate plaintiff.  There is no evidence that Coleman knew that plaintiff participated in the August 2010 protected activity.  Thus, there is no causal link between plaintiff's August 2010 protected activity and his termination.  Def. St. Undisputed Facts ¶ 37. *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015) ("A plaintiff . . . cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted."); *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

Plaintiff has not presented sufficient evidence to raise an inference that Cheyney's proffered reasons for termination were pretextual, nor could a reasonable jury find by a preponderance of the evidence that "there is a 'but-for' causal connection between the adverse employment action and retaliatory action." *Carvalho-Grevious*, 851 F.3d at 258.  Accordingly, plaintiff's retaliation claim fails under the third step of *McDonnell Douglas*.

B. **Retaliatory Hostile Work Environment**

Plaintiff also alleges that he experienced a hostile work environment in retaliation for his participation in protected activities.  In order to establish a retaliatory hostile work environment claim, a plaintiff must prove: (1) he or she suffered intentional discrimination because of his or her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him or her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.  *Yarnall v. Philadelphia Sch. Dist.*, 57 F. Supp. 3d 410, 436 (E.D. Pa. 2014).

Plaintiff avers the following retaliatory actions: VP Moszer sent a plaintiff a counseling

letter and "engaged in belittling micromanagement," President Vital sent plaintiff a counseling memorandum,[17] his coworkers "nitpicked over all his decisions," Baylor threatened plaintiff through a violation letter, and plaintiff experienced "hostility, micromanagement, and unfair criticism by Cheyney administrative employees."

Plaintiff has not satisfied the first prong of the hostile work environment test. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of" a protected characteristic. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). On this issue, the record before the Court discloses no discriminatory comments and no action of a retaliatory nature. The record is devoid of evidence that Coleman, plaintiff's supervisor, and Baylor, who sent the violation letter, were even aware that plaintiff participated in the Jones EEOC investigation that allegedly precipitated the retaliatory hostility.

Plaintiff also has not satisfied the second prong of the hostile work environment test: that the discrimination was severe or pervasive. "The threshold for pervasiveness and regularity of discriminatory conduct is high. A hostile work environment is actionable under Title VII only if it is so severe and pervasive that it alters the conditions of the victim's employment and creates an abusive working environment." *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001)) (internal quotations omitted).

---

[17] Defendant argues that all alleged retaliatory actions occurring before fall 2009, which includes the follow-up communications from plaintiff's counseling session, are not cognizable because EEOC charges were not filed within 300 days of the alleged unlawful employment practice, as required by Pennsylvania law. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013). Plaintiff contends that, notwithstanding the time bar, under the continuing violation doctrine, "discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" *Id.* The Court assumes without deciding that the continuing violation doctrine permits consideration of all putative retaliatory actions. Even viewing the facts in the light most favorable to plaintiff, the Court concludes that the evidence of record does not support a hostile work environment claim.

Looking at all of the complained-of behavior objectively, the behavior does not amount to severe or pervasive harassment. Even assuming that plaintiff received an unfounded and unjustified violation letter, such a letter, unaccompanied by any adverse employment action, does not amount to an objective change in the conditions of his employment. *See, e.g., id*. at 173 (3d Cir. 2014) ("Simple teasing, offhand comments, and isolated incidents do not amount to discriminatory changes in the terms and conditions of employment."). Such a conclusion is further reinforced by the undisputed "routine" nature of the violation letters; four other Cheyney employees received similar violation letters within a two-month span. Def. St. Undisputed Facts ¶ 42. The above incidents may have frustrated plaintiff, but as the Supreme Court has stated, Title VII does not set forth "a general civility code for the American workplace." *Oncale*, 523 U.S. at 80. Considering all of plaintiff's allegations together, they do not give rise to a triable issue of fact on plaintiff's claim that he was subjected to severe or pervasive hostility.

Plaintiff has not proven the first two elements of his retaliatory hostile work environment claim. The Court need not address the remaining elements of that claim because plaintiff has failed to establish a *prima facie* case.

## V. CONCLUSION

For the above reasons, the Court concludes (1) plaintiff has abandoned his claims of hostile work environment based on racial and gender animus and termination due to race and gender discrimination; (2) plaintiff failed to provide adequate evidence of pretext in support of his retaliatory termination claim; and (3) plaintiff failed to establish a *prima facie* case of a retaliatory hostile work environment. Thus, defendant's Motion for Summary Judgment is granted, and judgment is entered in favor of defendant, Cheyney University of Pennsylvania, and against plaintiff, Howard Hudson, III. An appropriate order follows.